**FILED**

JUL 1 7 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOISES ISSAC BIRELAS,<br><br>  Petitioner,<br><br>  vs.<br><br>FRANCISCO JACQUEZ, Warden,<br><br>  Respondent. | No. C 10-01355 EJD (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |

Petitioner has filed a <u>pro se</u> Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 challenging a judgment of conviction from Santa Cruz Superior Court. Doc. #1. For the reasons set forth below, the Petition for a Writ of Habeas Corpus is **DENIED**.

### PROCEDURAL BACKGROUND

In 2007, a jury convicted Petitioner of murder with a felony-murder special circumstance, attempted second-degree robbery, and conspiracy to commit attempted robbery. Doc. #14 at 552–54; Doc. #35 at 3253–54. The state trial court sentenced Petitioner to a term of life without possibility of parole on the murder count. The state trial court also sentenced Petitioner to the midterms of two years and four years for attempted robbery and conspiracy, respectively, which was stayed

Order Denying Petition; Denying Certificate of Appealabilty
G:\PRO-SE\SJ.EJD\HC.10\Birelas01355_deny petition-coa.wpd

1    pursuant to Cal. Penal Code § 654.  Doc. #37 at 3512–15.  The state appellate court

2    affirmed the judgment on February 9, 2009, <u>see</u> Doc. #41, Exh. 9, and the California

3    Supreme Court denied review on April 15, 2009, <u>see id.</u>, Exh. 11.  Petitioner filed a

4    petition for a writ of habeas corpus in the Santa Cruz Superior Court, which was

5    denied on June 23, 2009.  <u>Id.</u>, Exh. 12.  Petitioner filed a petition for a writ of habeas

6    corpus in the state appellate court, which was summarily denied on August 7, 2009.

7    <u>Id.</u>, Exh. 13.  Petitioner then filed a petition for a writ of habeas corpus in the

8    California Supreme Court, which was summarily denied on February 3, 2010.  <u>Id.</u>,

9    Exh. 14.  Petitioner subsequently filed this instant petition for a writ of habeas

10   corpus on March 30, 2010.  Doc. #1.

**DISCUSSION**

A.    <u>Factual Background</u>

13          The facts of Petitioner's underlying offenses were summarized in the state

14   appellate court's opinion:

> Apartment 233 at Northgate Apartments was
> rented to 24-year-old Jessica Garcia, who lived there
> with her 19-year-old sister, Juliana.  About a week
> before the murder, Maria Fernanda Sanchez (known by
> the witnesses as "Fernanda") began staying at the
> apartment with her 22-month-old baby.  Juliana
> introduced Fernanda to methamphetamine, and Fernanda
> supplied money for drugs instead of paying rent.
>
> The events surrounding the murder were
> described primarily by Juliana, Jessica, and Fernanda.
> Juliana and Fernanda were deemed accomplices, while
> the status of Jessica as an accomplice was left to the jury
> to decide.  Juliana testified pursuant to an agreement
> with the prosecution, under which she pleaded guilty to
> voluntary manslaughter, while Fernanda testified for the
> prosecution in exchange for a similar plea.
>
> In March 2006 Fernanda worked at a fruit stand,
> where the victim, John Beltran, was a daily customer.
> Beltran would bring Fernanda coffee and he repeatedly
> asked her for a date.  She always refused.  Beltran once
> loaned Fernanda money after she told him that her boss
> had not paid her.  About two weeks after she started
> working there and about a week before the murder,
> Fernanda met Juliana and Jessica at the fruit stand.
> Fernanda introduced Beltran to Juliana and Jessica while

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

they were all there.  Two days later Beltran gave the sisters his cell phone number in case they wanted to go out with him.  Juliana had seen Beltran holding a large roll of money tied with a rubber band.

On March 29, 2006, Fernanda, Juliana, and Jessica were in the apartment using methamphetamine. At some point during the afternoon, the sisters left, but it was still light outside when they returned. Accompanying them were Juliana's boyfriend, Uriel Luengas, and Uriel's older brother, [Petitioner].

Juliana and Jessica had left the apartment to pick up Uriel at an arranged meeting place.  Accompanied by [Petitioner], Uriel got into the car and the four drove to a Big 5 store to buy bullets.  At Uriel's request Jessica bought the bullets and gave them to him.  After returning to the apartment, Uriel and Juliana went out to buy methamphetamine, returning about 7:30 pm.

When they returned, Fernanda was putting her baby to bed and Jessica was getting ready to go out with her boyfriend, Eric Atilano.  Between 7 and 8 p.m. the three women, Uriel, and [Petitioner] continued to smoke methamphetamine in Jessica's room.

At some point [Petitioner] said that they needed more money to get more drugs.  He mentioned robbery, and Juliana suggested Beltran as an easy target. Fernanda was not present, having gone into the living room to feed her baby, but Juliana knew that she had Beltran's telephone number.

Juliana entered the living room with Uriel's cell phone and told her to call Beltran.  [Petitioner], Juliana, and Uriel assured Fernanda that all they would do was take Beltran's money.  Fernanda made the call.  Beltran was sick, but he agreed to go out to eat with her.  As instructed by [Petitioner] or Uriel, Fernanda told Beltran to meet in two hours at a grocery store in a shopping center.  Fernanda had seen Uriel and [Petitioner] passing a gun back and forth, and she expressed concern about being hurt; but they told her they were only going to scare Beltran with it.

Juliana told Jessica about the plan, and Jessica agreed to allow Juliana to use her car.[1]  Juliana, Uriel, and [Petitioner] left the apartment to carry out their plan, while Fernanda stayed behind.  Fernanda testified that Jessica's boyfriend, Eric, had arrived, and the two were in Jessica's bedroom.  Juliana, however, said that she

---

[1]Jessica testified, however, that she knew nothing until after the shooting, when Juliana told her about it.

1   saw Jessica leave the apartment 20-25 minutes after the
2   phone call to meet Eric. About an hour and a half after
    Jessica left, Juliana left for the shopping center with
3   [Petitioner] and Uriel. Jessica estimated that she left the
    apartment with Eric at about 9 p.m.

4           Sometime later Fernanda received a call from
5   Uriel, who told her to call Beltran and tell him to meet
    her at an old hospital building near the apartment
6   complex. Fernanda was also told to tell Jessica to go to
    where they were, as her car had broken down. Fernanda
7   gave Jessica the message, and Jessica left with Eric.

8           Shortly thereafter Uriel called Fernanda again and
    told her to go to the office. When she did so, [Petitioner]
9   met her and told her to get in the car. She got into the
    back seat with her baby and Juliana, and Uriel drove to
10  the first entrance to the apartment parking lot, where
    they saw Beltran's truck. The group returned to the
11  office, and [Petitioner] and Uriel told her to get out.
    They directed Fernanda to walk over to Beltran's truck
12  and "entertain" him in there.

13          Fernanda got in the passenger side, and Beltran
    talked to her briefly. Fernanda then saw two people
14  standing at the driver's window; one was holding a gun,
    but she could not tell who. Beltran started to drive away
15  when a shot rang out. Beltran told Fernanda to duck
    down, as "they had killed him." She then opened the
16  passenger door and fell out of the truck. [Petitioner]
    picked her up as Uriel ran. Fernanda and [Petitioner] ran
17  back to the apartment, where she met up with Juliana,
    who had parked the car there and was carrying the baby.
18  Once inside, Fernanda began crying; she told them what
    Beltran had said to her, but [Petitioner] told her that
19  nothing had happened to him. Juliana also began to cry.
    [Petitioner] was relaxed; he and Uriel continued to pass
20  the gun back and forth.

21          Fernanda went into Juliana's room. Shortly
    thereafter [Petitioner] entered and tried to comfort her.
22  They began having sex until Jessica came in and told
    them to leave Juliana's room. They went into the living
23  room and continued to have sex, while Juliana went into
    her own room. Meanwhile, at Uriel's direction, Jessica
24  took the gun to his father's house and hid it under the
    tire of a truck parked there.

25          Joe Martinez, custodian at the old Watsonville
    Hospital, saw Beltran's truck moving slowly along with
26  the door open. The truck began to turn and circle until it
    struck a bush. When Martinez approached the truck, he
27  saw Beltran slumped over in the seat, and he called 911.
    Emergency personnel pronounced Beltran dead at the
28  scene.

United States District Court
For the Northern District of California

1        On March 31, 2006, police interviewed Fernanda,
2    Juliana, and Jessica in separate rooms. After initially
denying involvement, each eventually confessed to her
3    own involvement and the role of the others. Juliana and
Fernanda each agreed to plead guilty to voluntary
4    manslaughter and testify at trial in exchange for a
stipulated sentence. In her agreement with the
5    prosecution, Jessica pleaded guilty to being an accessory
after the fact with five years' probation. At trial,
6    however, she denied much of what she had eventually
told the detectives during her interview.

7 People v. Birelas, No. H031803, 2009 WL 296997 at *1–*3 (Cal. Ct. App. Feb. 9,

8 2009) (footnote in original, renumbered).

9 B.    Standard of Review

10        This Court may entertain a petition for a writ of habeas corpus "in behalf of a

11 person in custody pursuant to the judgment of a State court only on the ground that

12 he is in custody in violation of the Constitution or laws or treaties of the United

13 States." 28 U.S.C. § 2254(a). The writ may not be granted with respect to any claim

14 that was adjudicated on the merits in state court unless the state court's adjudication

15 of the claim: "(1) resulted in a decision that was contrary to, or involved an

16 unreasonable application of, clearly established Federal law, as determined by the

17 Supreme Court of the United States; or (2) resulted in a decision that was based on

18 an unreasonable determination of the facts in light of the evidence presented in the

19 State court proceeding." Id. § 2254(d).

20        "Under the 'contrary to' clause, a federal habeas court may grant the writ if

21 the state court arrives at a conclusion opposite to that reached by [the Supreme]

22 Court on a question of law or if the state court decides a case differently than [the]

23 Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529

24 U.S. 362, 412–13 (2000). The only definitive source of clearly established federal

25 law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the

26 Supreme Court as of the time of the state court decision. Williams, 529 U.S. at 412;

27 Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be

28 "persuasive authority" for purposes of determining whether a state court decision is

1    an unreasonable application of Supreme Court precedent, only the Supreme Court's

2    holdings are binding on the state courts and only those holdings need be

3    "reasonably" applied. Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003),

4    overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003).

5         "Under the 'unreasonable application" clause, a federal habeas court may

6    grant the writ if the state court identifies the correct governing legal principle from

7    [the Supreme Court's] decisions but unreasonably applies that principle to the facts

8    of the prisoner's case." Williams, 529 U.S. at 413. "Under § 2254(d)(1)'s

9    'unreasonable application' clause, . . . . a federal habeas court may not issue the writ

10   simply because that court concludes in its independent judgment that the relevant

11   state-court decision applied clearly established federal law erroneously or

12   incorrectly." Id. at 411. A federal habeas court making the "unreasonable

13   application" inquiry should ask whether the state court's application of clearly

14   established federal law was "objectively unreasonable." Id. at 409. The federal

15   habeas court must presume correct any determination of a factual issue made by a

16   state court unless the petitioner rebuts the presumption of correctness by clear and

17   convincing evidence. 28 U.S.C. § 2254(e)(1).

18        The state court decision to which Section 2254(d) applies is the "last

19   reasoned decision" of the state court. See Ylst v. Nunnemaker, 501 U.S. 797,

20   803–04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091–92 (9th Cir. 2005). When

21   there is no reasoned opinion from the highest state court considering petitioner's

22   claims, the court "looks through" to the last reasoned opinion. See Ylst, 501 U.S. at

23   805; Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). Where the

24   state court gives no reasoned explanation of its decision on a petitioner's federal

25   claim and there is no reasoned lower court decision on the claim, an independent

26   review of the record is the only means of deciding whether the state court's decision

27   was objectively reasonable. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

28   2003).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    In three decisions issued last term, and again in a decision issued this term,

2    the Supreme Court vigorously and repeatedly affirmed that under AEDPA, there is a

3    heightened level of deference a federal habeas court must give to state court

4    decisions. See Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curiam); Harrington

5    v. Richter, 131 S. Ct. 770, 783–85 (2011); Premo v. Moore, 131 S. Ct. 733, 739–40

6    (2011); Felkner v. Jackson, 131 S. Ct. 1305 (2011) (per curiam). As the Court

7    explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential

8    standard for evaluating state-court rulings' and 'demands that state-court decisions

9    be given the benefit of the doubt.'" Felkner, 131 S. Ct. at 1307 (citation omitted).

10   With these principles in mind regarding the standard and limited scope of review in

11   which this Court may engage in federal habeas proceedings, the Court addresses

12   Petitioner's claims.

13   C.    Claims and Analysis

14         Petitioner raises the following grounds for federal habeas relief: instructional

15   error; prosecutorial misconduct; and ineffective assistance of appellate counsel. See

16   Doc. #1. Each claim is analyzed in turn below.

17         1.    Instructional Error

18         Petitioner claims that his right to a fundamentally fair trial was violated by the

19   trial court's rejection of his proposed jury instructions to supplement and clarify

20   CALCRIM Nos. 334 and 335. Petitioner argues that CALCIM Nos. 334 (defining

21   accomplice when the status is disputed) and 335 (precluding conviction when

22   evidence of guilt consists solely of uncorroborated accomplice testimony) were

23   deficient in that they failed to instruct that the independent corroborative evidence

24   must connect the defendant to the commission of the crime, and that the independent

25   corroborative evidence must be evaluated without reference to the testimony of the

26   accomplices. Petitioner further argues that CALCRIM Nos. 334 and 335, combined

27   with the other CALCRIM instructions, led to juror confusion. In his traverse,

28   Petitioner also argues for the first time that the instructional error led to the jury

United States District Court

For the Northern District of California

1    incorrectly finding that Jessica was not an accomplice.  Doc. #42 at 11–12.

2        The state appellate court summarized the relevant facts as follows:

3            Because there was evidence that Jessica was an accomplice and
     that fact was in dispute, the trial court had a *sua sponte* duty to instruct
4    the jury on accomplice testimony.  (People v. Tobias (2001) 25 Cal.4th
     327, 331.)  The court accordingly informed the jurors that before they
5    could consider Jessica's testimony as incriminating evidence, they had
     to decide whether she was an accomplice to the charged crimes and
6    allegations.  Consistently with section 1111 and CALCRIM No. 334,
     the court defined "accomplice" as a person who is "subject to
7    prosecution for the identical crime charged against the [d]efendant."  It
     then explained what "subject to prosecution" means and elaborated on
8    the definition.[2]

9            The court instructed the jurors that if they decided that Jessica
     was an accomplice, then they were not permitted to "convict
10   [Petitioner] of the charged crimes or special allegations based on her
     statement or testimony alone.  You may use the statement or testimony
11   of an accomplice to convict [Petitioner] only if: One, the accomplice's
     statement or testimony is supported by other evidence that you believe;
12   two, that supporting evidence is independent of the accomplice's
     statement or testimony[; and] three, that supporting evidence tends to
13   connect [Petitioner] to the commission of the crimes."

14           The court further explained the requirement of supporting
     evidence as follows: "Supporting evidence, however, may be slight.  It
15   does not need to be enough by itself to prove that [Petitioner] is guilty
     of the charged crimes, and it does not need to support every fact
16   mentioned by the accomplice in the statements or about which the
     accomplice testified.  On the other hand, it is not enough if the
17   supporting evidence merely shows that a crime was committed or the
     circumstances of its commission.  The supporting evidence must tend
18   to connect the defendant to the commission of the crime."

19           Finally, the court cautioned that "[t]he evidence needed to
     support the statement or testimony of one accomplice cannot be
20   provided by the statements or testimony of another accomplice.  []  Any
     statement or testimony of an accomplice that tends to incriminate
21   [Petitioner] should be viewed with caution.  You may not, however,
     arbitrarily disregard it.  You should give that statement or testimony the
22   weight you think it deserves after examining it with care and caution

23   _____

24       [2]The court stated: "Someone [is] subject to prosecution if she personally
     committed the crime, or if: []  One, she knew of the criminal purpose of the person
25   who committed the crime and, two, she intended to and did in fact aid, facilitate,
     promote, encourage or instigate the commission of the crime or participate in a
26   criminal conspiracy to commit the crime....  []  An accomplice does not need [to be]
     present when a crime is committed. On the other hand, a person is not an accomplice
27   just because she is present at the scene of a crime, even if he or she knows that the
     crime will be committed or is being committed and does nothing to stop it....  []  A
28   person may be an accomplice even if he or she is not actually prosecuted for the
     crime."

1    and in the light of all the other evidence."

2          The court then directed the jury to Juliana and Fernanda, stating
     that if the alleged crimes were committed, then these witnesses were
3    accomplices as a matter of law. The court gave CALCRIM No. 335,
     which is similar to CALCRIM No. 334 but pertains to testimony of
4    witnesses deemed accomplices as a matter of law.

5    People v. Birelas, No. H031803, 2009 WL 296997 at *3–*4 (Cal. Ct. App. Feb. 9,

6    2009) (footnote in original, renumbered).

7                a.      Legal Standard

8          A challenge to a jury instruction solely as an error under state law does not

9    state a claim cognizable in federal habeas corpus proceedings. See Estelle v.

10   McGuire, 502 U.S. 62, 71–72 (1991). A claim of instructional error requires federal

11   habeas relief only where the error "'by itself so infected the entire trial that the

12   resulting conviction violates due process.'" Estelle, 502 U.S. at 72 (quoting Cupp v.

13   Naughten, 414 U.S. 141, 147 (1973)); Henderson v. Kibbe, 431 U.S. 145, 154

14   (1977); Turner v. Calderon, 281 F.3d 851, 865–66 (9th Cir. 2002). An instructional

15   error will violate due process only when there is a reasonable likelihood that the jury

16   has applied the challenged instruction in a way that violates the Constitution, see

17   Estelle, 502 U.S. at 72, and where the erroneous instructions had a substantial and

18   injurious effect on the verdict, see Brecht v. Abrahamson, 507 U.S. 619, 637–38

19   (1993). The instruction may not be judged in artificial isolation, but must be

20   considered in the context of the instructions as a whole and the trial record. See

21   Estelle, 502 U.S. at 72; see also United States v. Frady, 456 U.S. 152, 169 (1982)

22   (citing Henderson, 431 U.S. at 154).

23         A state trial court's refusal to give an instruction does not alone raise a

24   ground cognizable in a federal habeas corpus proceeding. See Dunckhurst v. Deeds,

25   859 F.2d 110, 114 (9th Cir. 1988). The error must so infect the trial that the

26   petitioner was deprived of the fair trial guaranteed by the Fourteenth Amendment.

27   See id. The omission of an instruction is less likely to be prejudicial than a

28   misstatement of the law. See Walker v. Endell, 850 F.2d 470, 475–76 (9th Cir.

United States District Court
For the Northern District of California

1  1987) (citing <u>Henderson</u>, 431 U.S. at 154).  The significance of the omission may be

2  evaluated by comparing the omitted instruction with the instructions that were given.

3  <u>Murtishaw v. Woodford</u>, 255 F.3d 926, 971 (9th Cir. 2001) (quoting <u>Henderson</u>, 431

4  U.S. at 156).

5          b.     Analysis

6        Petitioner did not directly argue on appeal that the instructional error led to

7  the jury incorrectly finding that Jessica was not an accomplice.  Petitioner's

8  instructional error claim on appeal focused on whether the jury properly understood

9  the corroboration requirement.  The state appellate court rejected this claim,

10  explaining:

11          On appeal, [Petitioner] argues that these instructions were
   inadequate to convey two principles: (1) "that the independent
12  corroborative evidence must connect the defendant to the commission
   of the crime, and not merely to those who committed it"; and (2) "that
13  analysis of the allegedly independent corroborative evidence is
   evaluated without reference to the testimony of the accomplices, and
14  not in light of the testimony of the accomplices." [Petitioner] argues
   that other instructions given – specifically, CALCRIM Nos. 226, 316,
15  358, 359, and 371 – "tended to obfuscate the section 1111 requirement
   of independent corroborative evidence."
16
           The requirement that a jury be instructed on how to consider the
17  testimony of accomplices is derived from section 1111[3] which
   implicitly recognizes "that an accomplice is inherently untrustworthy
18  because he or she 'usually testif[ies] in the hope of favor or the
   expectation of immunity.' [Citation.]  In addition, an accomplice may
19  try to shift blame to the defendant in an effort to minimize his or her
   own culpability. [Citation.]" (<u>People v. Tobias</u>, <u>supra</u>, 25 Cal.4th at
20  p. 331.)  Finally, "accomplice testimony is frequently cloaked with a
   plausibility which may interfere with the jury's ability to evaluate its
21  credibility. '"[A]n accomplice is not merely a witness with a possible
   motive to tell lies about an innocent accused but is such a witness
22  peculiarly equipped, by reason of his inside knowledge of the crime, to
   convince the unwary that his lies are the truth."' [Citations.]" (<u>People
23  v. Tewksbury</u> (1976) 15 Cal.3d 953, 967.)

24

25         [3]Section 1111 states: "A conviction cannot be had upon the testimony of an
26  accomplice unless it be corroborated by such other evidence as shall tend to connect
   the defendant with the commission of the offense; and the corroboration is not
27  sufficient if it merely shows the commission of the offense or the circumstances
   thereof.  [] An accomplice is hereby defined as one who is liable to prosecution for
28  the identical offense charged against the defendant on trial in the cause in which the
   testimony of the accomplice is given."

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

The corroboration requirement, the focus of [Petitioner's] argument on appeal, calls for evidence that "tend[s] to implicate the defendant and therefore must relate to some act or fact [that] is an element of the crime." (People v. Zapien (1993) 4 Cal.4th 929, 982.) The corroborative evidence may be circumstantial, and it "'may be slight and entitled to little consideration when standing alone.'" (People v. Tewksbury (1976) 15 Cal.3d 953, 969; People v. Richardson (2008) 43 Cal.4th 959, 1024.) However, as [Petitioner] emphasizes, it must be evidence independent of and unaided by the accomplice's testimony, and it may not come from any other accomplice. (People v. Davis (2005) 36 Cal.4th 510, 543.) "Such independent evidence' "need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth....""" (Ibid.)

We believe that the CALCRIM instructions given were adequate to educate the jury on the corroboration requirement. CALCRIM No. 334 clearly states that the defendant may not be convicted based on accomplice testimony alone; that testimony may be used only if it is supported by other credible evidence that is "independent of the accomplice's ... testimony" and that "tend[s] to connect the defendant to the commission of the crime[s]." (CALCRIM No. 334 .) It was not error to refuse to add the third paragraph of CALJIC No. 3.12 to the court's instructions, as [Petitioner] suggested; that text, while providing more detailed, precise direction, was not necessary to reinforce the principle that the corroboration had to be independent of the accomplice's testimony.[4] Moreover, the Judicial Council, in publishing the CALCRIM instructions, emphasized that "[t]he CALJIC and CALCRIM instructions should never be used together." (Guide for Using Judicial Council of California Criminal Jury Instructions (CALCRIM), p. xxiii.)

It was likewise not error to refuse [Petitioner's] suggestion to include the following language based on People v. Falconer (1988) 201 Cal.App.3d 1540, 1543: "[I]t is not sufficient to merely connect a defendant with the accomplice or other persons participating in the crime. The evidence must connect the defendant with the crime, not simply with its perpetrators." As this concept was covered by CALCRIM Nos. 334 and 335, the trial court properly decided to "stick to the CALCRIM instruction."

We further find no probability of confusing the jurors by giving

---

[4]The CALJIC No. 3.12 text [Petitioner] sought to add to the jury instructions stated: "In determining whether an accomplice has been corroborated, you must first assume the testimony of the accomplice has been removed from the case. You must then determine whether there is any remaining evidence which tends to connect [Petitioner] with the commission of the crime. [] If there is no independent evidence which tends to connect [Petitioner] with the commission of the crime, the testimony of the accomplice is not corroborated."

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CALCRIM Nos. 226, 316, 358, 359, and 371.[5]  The trial court admonished the jurors that *if* they found Jessica *not* to be an accomplice, then supporting evidence would not be required and they should then "evaluate her statement or testimony as [they] would that of any other witness."

Moreover, there is no evidence to suggest that the jurors misapplied the instruction, or any reason to conclude that they were incapable of understanding and applying more specific accomplice instructions. (People v. Smith (2007) 40 Cal.4th 483, 517-518 [courts presume jurors "generally understand and faithfully follow instructions"].)  Those instructions were adequate to delineate the jury's task in evaluating the testimony of Jessica, Juliana, and Fernanda.

People v. Birelas, No. H031803, 2009 WL 296997 at *4–*5 (Cal. Ct. App. Feb. 9, 2009) (footnotes in original, renumbered).

After careful review of the relevant law and the facts of Petitioner's case, the

---

[5]CALCRIM No. 226 contains the following text which [Petitioner] contends was potentially confusing: "You alone, must judge the credibility or believability of the witnesses.  In deciding whether testimony is true and accurate, use your common sense and experience.  You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have.  You may believe all, part, or none of any witness's testimony.  Consider the testimony of each witness and decide how much of it you believe. []  In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony."  The portion of CALCRIM No. 316 read to the jury states: "If you find that a witness has been convicted of a felony, you may consider that fact only in evaluating the credibility of the witness's testimony.  The fact of a conviction does not necessarily destroy or impair a witness's credibility.  It is up to you to decide the weight of that fact and whether that fact makes the witness less believable. []  If you find that a witness has committed a crime or other misconduct, you may consider that fact only in evaluating the credibility of the witness's testimony.  The fact that the witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness's credibility.  It is up to you to decide the weight of that fact and whether that fact makes the witness less believable."  CALCRIM No. 358 called attention to evidence of [Petitioner's] oral statements before trial.  The jurors were told that they must decide whether [Petitioner] made any of those statements and, if so, how much importance to give to them.  The CALCRIM No. 359 instruction stated that [Petitioner] "may not be convicted of any crime based on his out-of-court statements alone.  You may only [sic ] rely on the [Petitioner's] out-of-court statements to convict him[/her] if you conclude that other evidence shows that the charged crime was committed. []  That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed. []  The identity of the person who committed the crime and degree of the crime may be proved by the [Petitioner's] statements alone."  Finally, CALCRIM No. 371 instructed, "If the [Petitioner] tried to hide evidence, that conduct may [show] that he was aware of his guilt. If you conclude that [Petitioner] made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

United States District Court
For the Northern District of California

1    Court cannot say that the state court's determination regarding Petitioner's

2    instructional error claim was contrary to or involved an unreasonable application of

3    clearly established federal law or that it resulted in a decision that was based on an

4    unreasonable determination of the facts in light of the evidence presented in the state

5    court proceeding.  28 U.S.C. § 2254(d).

6                          1)    Jessica's accomplice status

7          The Court independently reviews the record to determine whether the trial

8    court was unreasonable in deciding that Jessica's accomplice status was in dispute.

9    Cal. Penal Code § 1111 defines an accomplice as "one who is liable to prosecution

10   for the identical offense charged against the defendant on trial in the cause in which

11   the testimony of the accomplice is given." Cal. Penal Code § 1111.  CALCRIM No.

12   334, as given at trial, further explained that an accomplice must "one, [know] of the

13   criminal purpose of the person who committed the crime and, two, [intend to and in

14   fact] aid, facilitate, promote, encourage or instigate the commission of the crime or

15   participate in a criminal conspiracy to commit the crime . . . An accomplice does not

16   need [to be] present when a crime is committed.  On the other hand, a person is not

17   an accomplice just because she is present at the scene of a crime, even if he or she

18   knows that the crime will be committed or is being committed and does nothing to

19   stop it . . ." Doc. #33 at 2782–83.  Based on the evidence presented at trial, the trial

20   court reasonably concluded that Jessica's accomplice status was in dispute.

21         At trial, Juliana and Fernanda both acknowledged that Jessica was present in

22   the apartment when the robbery was being planned; that Jessica was aware that

23   Juliana, Fernanda, Petitioner and Uriel Luengas intended to rob Beltran; and that

24   Jessica later helped hide the gun.  However, they also both testified, consistent with

25   Jessica's testimony, that Jessica was not involved in planning or executing the

26   robbery.  Both Juliana and Fernanda testified that Jessica was in a different room

27   when the robbery was being planned and was out on a date while the robbery was

28   being executed.  Although Jessica purchased bullets for the gun that was ultimately

United States District Court

For the Northern District of California

used as the murder weapon, it is undisputed that Jessica's purchase of the bullets
was unrelated to the plan to rob Beltran. Jessica purchased the bullets at Uriel
Luengas' request during the late afternoon on March 29, 2006, and the idea to rob
Beltran was conceived hours later in the evening of March 29th. It was reasonable
for the trial court to have instructed the jurors to consider Juliana and Fernanda
accomplices as a matter of law, but to instruct with CALCRIM No. 334 as to Jessica
since there was a factual dispute as to Jessica's accomplice status. Similarly, it
would be reasonable for the jurors to find that there was insufficient evidence to
conclude that Jessica was an accomplice. Jessica's knowledge of the robbery plan,
her use of methamphetamine, and her presence in the apartment at the time the
robbery was planned are insufficient to make her an accomplice at law, contrary to
Petitioner's assertions. Petitioner's argument that there was more than ample
evidence of Jessica's accomplice status is unsupported by the record.

> 2)   Jury instruction regarding corroboration requirement

As an initial matter, "to the extent that the uncorroborated testimony is not
'incredible or insubstantial on its face,' [Cal. Penal Code § 1111's prohibition on
convictions based solely upon uncorroborated accomplice testimony] is not required
by the Constitution or federal law." Laboa v. Calderon, 224 F.3d 972, 979 (9th Cir.
2000) (citations omitted); see also United States v. Augenblick, 393 U.S. 348, 352
(1969) ("When we look at the requirements of procedural due process, the use of
accomplice testimony is not catalogued with constitutional restrictions."). Even if
the Court assumes that the testimonies of accomplices Fernanda and Juliana were
uncorroborated, a review of the record indicates that their testimonies were neither
incredible or insubstantial on their face. Fernanda and Juliana testified that
Petitioner helped plan the robbery and accompanied Fernanda to her meeting with
Beltran. Fernanda testified that she saw Petitioner and co-defendant Uriel Luengas
passing the murder weapon between themselves and stating that they planned to use
the gun to scare Beltran. Fernanda also testified that after Beltran was shot, she fell

1   out of the car and was picked up by Petitioner. Fernanda and Juliana both testified

2   that Petitioner ran back to Apartment 223 after the shooting. Juliana testified that

3   Petitioner confessed to shooting Beltran. Because there is no Supreme Court case

4   holding that accomplice testimony must be corroborated and that the jury must be so

5   instructed and because Fernanda and Juliana's testimonies are neither incredible nor

6   insubstantial on their face, the state court's rejection of this claim cannot be said to

7   be contrary to or involving an unreasonable application of clearly established federal

8   law. See Wright v. Van Patten, 552 U.S. 120, 126 (2008) (per curium) ("Because

9   [the Supreme Court] cases give no clear answer to the question presented, let alone

10  one in [the petitioner's] favor, it cannot be said that the state court unreasonabl[y]

11  appli[ed] clearly established Federal law.") (internal quotation marks omitted);

12  Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004) ("If no Supreme Court precedent

13  creates clearly established federal law relating to the legal issue the habeas petitioner

14  raised in state court, the state court's decision cannot be contrary to or an

15  unreasonable application of clearly established federal law.").

16        Because the accomplice testimony was neither incredible nor insubstantial on

17  its face and because Cal. Penal Code § 1111 is a state rule, habeas relief is available

18  for Petitioner only if the challenged instruction by itself so infected the entire trial

19  that the resulting conviction violates due process, see Estelle, 502 U.S. at 72 and

20  Dunckhurst, 859 F.2d at 114, or the alleged violation of Cal. Penal Code § 1111

21  denied Petitioner his due process right to fundamental fairness, see Laboa, 224 F.3d

22  at 979 (citing Estelle, 502 U.S. at 72–73).

23        Viewed in light of the instructions as a whole and the evidence introduced at

24  trial, CALCRIM Nos. 334 and 335 did not so infect the trial that the resulting

25  conviction violated due process. As the state appellate court noted, while CALJIC

26  No. 3.12 more precisely discusses that corroborating evidence must be independent

27  of the accomplice's testimony, CALCRIM No. 334 adequately conveys the same

28  principle. CALCRIM No. 334 specifically instructs that the evidence supporting the

United States District Court
For the Northern District of California

1    accomplice's testimony "must tend to connect the defendant to the commission of

2    the crime," and that the supporting evidence must be "independent of the

3    accomplice's statement or testimony." CALCRIM No. 334. It was therefore

4    reasonable for the trial court to conclude that the proposed language was redundant

5    and that the jurors did not misapply the challenged instructions.

6         Furthermore, even if it is determined that the instructions violated Petitioner's

7    right to due process, Petitioner fails to demonstrate that the challenged instructions

8    had a substantial influence on his conviction and thereby resulted in actual prejudice

9    under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). As discussed above, a

10   reasonable juror could conclude from the evidence at trial that Jessica was not an

11   accomplice and that her testimony therefore did not require corroboration. As a non-

12   accomplice, Jessica's testimony could properly be used to corroborate the

13   accomplice testimony which indicated that Petitioner had helped to plan and execute

14   the robbery, and that Petitioner admitted to shooting Beltran. Moreover, outside of

15   Jessica's testimony, other witnesses provided evidence that supported the

16   accomplice testimony. Two non-accomplice witnesses confirmed that Petitioner

17   was at apartment 223 immediately prior to the robbery and the morning after the

18   robbery. Testimony by an independent witness and by police confirmed that the

19   passenger door of Beltran's vehicle was found open, consistent with Fernanda's

20   testimony that she fell out the passenger door after Beltran was shot. Evidence

21   presented at trial linked the murder weapon to Petitioner. There was sufficient

22   evidence of Petitioner's guilt. Given the record at trial, the challenged instructions

23   were unlikely to have had a substantial or injurious effect or influence in

24   determining the jury's verdict. Accordingly, habeas relief is unavailable for

25   Petitioner on this claim.

26        2.    Prosecutorial Misconduct

27        Petitioner claims that the prosecutor violated his Sixth Amendment right to a

28   fair trial by referring to inadmissible gang evidence in his cross-examination of

Order Denying Petition; Denying Certificate of Appealabilty
G:\PRO-SE\SJ.EJD\HC.10\Birelas01355_deny petition-coa.wpd  16

1   Jessica. Petitioner additionally claims that trial counsel was ineffective for failing to

2   seek an admonition regarding the prosecutor's allegedly improper reference. The

3   state appellate court summarized the relevant facts as follows:

4          During in limine proceedings, the defense moved to exclude
    evidence that [Petitioner] might have been a gang member in the past.
5   The trial court granted the motion and ordered the prosecution to "avoid
    any reference to gang activity, gang statements, gang anything." The
6   prosecutor had no objection.

7          During trial the prosecutor expressed concern that while on the
    witness stand Jessica had recanted numerous statements she had made as
8   part of her immunity agreement, including those implicating
    [Petitioner]. The prosecutor believed that Jessica was changing her
9   testimony out of fear, and he wanted to bring out testimony that Jessica
    was afraid of [Petitioner] at the time of the shooting and while testifying
10  one year later. The trial court did not believe Jessica was currently
    afraid; she looked "cocky" rather than fearful on the stand. The
11  prosecutor wanted to impeach Jessica with her statement to Detective
    McKinley that the morning after the shooting [Petitioner] had admitted
12  killing Beltran; but to avoid a mistrial, he wanted the court to remind her
    not to quote [Petitioner] as saying, "that's just one more on my back."
13  Out of the jury's presence the court admonished Jessica not to repeat the
    actual words [Petitioner] had used in admitting he had shot Beltran.
14
           When the jury returned, the prosecutor attempted to "refresh"
15  Jessica's recollection of [Petitioner's] admission the morning after the
    shooting by reminding her about her statements to the detectives. As on
16  the previous day, Jessica denied that [Petitioner] had said anything about
    what had happened. She maintained that she had lied when she told
17  detectives that [Petitioner] had admitted shooting Beltran. Then she
    explained that she had forgotten that it was Fernanda who had told her
18  that.

19         Another discrepancy was brought to light concerning whether
    Jessica hid her car before or after she learned of the shooting. On
20  cross-examination, she agreed with her statement to the detectives that
    she learned about the shooting before she hid the car, but it was only
21  after she returned that they told her Beltran was dead. On redirect, the
    prosecutor asked Jessica whether she was still lying to the detectives
22  when she made that statement; she said she was. The prosecutor then
    asked, "Are you talking about a shootout, almost, at the OK [C]orral
23  with Nortenos and Surenos–" At that point defense counsel objected as
    "Hearsay. Improper." The prosecutor queried, "You think so? It goes
24  to the very foundation of what we're talking about." The court
    interjected, "Excuse me. Let's not go there." The prosecutor then
25  completed his examination with one brief, redundant question, and the
    witness was excused. Shortly thereafter, the jury was dismissed for the
26  day.

27         When the jury had left, defense counsel objected that the
    prosecutor had mentioned Nortenos and Surenos, which had never been
28  mentioned in the police interview transcript that Jessica had been

1    reading.  The court agreed that it was improper; counsel and the court
2    had all "gone to great length[s] to keep Nortenos and Surenos out of this
     case," and the prosecutor had "just gratuitously brought it in."  The
3    prosecutor protested that he had not mentioned these gangs in relation to
     [Petitioner], but only as part of a story involving neighbors who had
4    guns.

5    People v. Birelas, No. H031803, 2009 WL 296997 at *6.

6              a.     Legal Standard

7         A defendant's due process rights are violated when a prosecutor's misconduct

8    renders a trial "fundamentally unfair."  Darden v. Wainwright, 477 U.S. 168, 181

9    (1986); Smith v. Phillips, 455 U.S. 209, 219 (1982) ("the touchstone of due process

10   analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not

11   the culpability of the prosecutor").  The appropriate standard of review is the narrow

12   one of due process and not the broad exercise of supervisory power.  Darden, 477

13   U.S. at 181.

14        Under Darden, the first issue is whether the prosecutor's remarks were

15   improper; if so, the next question is whether such conduct infected the trial with

16   unfairness.  Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005).  A prosecutorial

17   misconduct claim is decided "'on the merits, examining the entire proceedings to

18   determine whether the prosecutor's remarks so infected the trial with unfairness as

19   to make the resulting conviction a denial of due process.'"  Johnson v. Sublett, 63

20   F.3d 926, 929 (9th Cir. 1995).

21        The first factor in determining misconduct amounted to a violation of due

22   process is whether the trial court issued a curative instruction.  When a curative

23   instruction is issued, a court presumes that the jury has disregarded inadmissible

24   evidence and that no due process violation occurred.  See Greer v. Miller, 483 U.S.

25   756, 766 n.8 (1987); Darden, 477 U.S. at 182 (the Court condemned egregious,

26   inflammatory comments by the prosecutor but held that the trial was fair since

27   curative actions were taken by the trial judge); Tan, 413 F.3d at 1115 ("we presume

28   jurors follow the court's instructions absent extraordinary circumstances").  This

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    presumption may be overcome if there is an "overwhelming probability" that the

2    jury would be unable to disregard evidence and a strong likelihood that the effect of

3    the misconduct would be "devastating" to the defendant. See Greer, 483 U.S. at 766

4    n.8; Tan, 413 F.3d at 1115–16 (finding trial fair where jury received instructions five

5    different times to consider only the evidence presented, and not its sympathy for the

6    victim's life story).

7         Other factors which a court may take into account in determining whether the

8    misconduct rises to a level of a due process violation are:  (1) the weight of evidence

9    of guilt, compare United States v. Young, 470 U.S. 1, 19 (1985) (finding

10   "overwhelming" evidence of guilt) with United States v. Schuler, 813 F.2d 978, 982

11   (9th Cir. 1987) (in light of prior hung jury and lack of curative instruction, new trial

12   required after prosecutor's reference to defendant's courtroom demeanor);

13   (2) whether the misconduct was isolated or part of an ongoing pattern, see Lincoln v.

14   Sunn, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct relates to a

15   critical part of the case, see Giglio v. United States, 405 U.S. 150, 154 (1972)

16   (failure to disclose information showing potential bias of witness especially

17   significant because government's case rested on credibility of that witness); and

18   (4) whether a prosecutor's comment misstates or manipulates the evidence, see

19   Darden, 477 U.S. at 182.

20        "[A] court should not lightly infer that a prosecutor intends an ambiguous

21   remark to have its most damaging meaning or that a jury, sitting through lengthy

22   exhortation, will draw that meaning from the plethora of less damaging

23   interpretations." Williams v. Borg, 139 F.3d 737, 744 (9th Cir. 1998) (citing

24   Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974)).

25        With regard to an ineffective assistance of counsel claim, the legal standard is

26   set forth in Strickland v. Washington, 466 U.S. 668 (1984), which provides that a

27   petitioner must establish two things in order to prevail on a Sixth Amendment

28   ineffectiveness of counsel claim.  First, he must establish that counsel's performance

United States District Court
For the Northern District of California

1   was deficient, i.e., that it fell below an "objective standard of reasonableness" under

2   prevailing professional norms. Strickland, 466 U.S. at 687–88. Second, he must

3   establish that he was prejudiced by counsel's deficient performance, i.e., that "there

4   is a reasonable probability that, but for counsel's unprofessional errors, the result of

5   the proceeding would have been different." Id. at 694. A reasonable probability is a

6   probability sufficient to undermine confidence in the outcome. Id. The Strickland

7   framework for analyzing ineffective assistance of counsel claims is considered to be

8   "clearly established Federal law, as determined by the Supreme Court of the United

9   States" for the purposes of 28 U.S.C. § 2254(d) analysis. See Cullen v. Pinholster,

10  131 S. Ct. 1388, 1403 (2011); Williams (Terry) v. Taylor, 529 U.S. 362, 404–08

11  (2000).

12      A "doubly" deferential judicial review is appropriate in analyzing ineffective

13  assistance of counsel claims under § 2254. See Pinholster, 131 S. Ct. at 1410–11;

14  Harrington, 131 S. Ct. at 788 (same); Premo v. Moore, 131 S. Ct. 733, 740 (2011)

15  (same). The general rule of Strickland, i.e., to review a defense counsel's

16  effectiveness with great deference, gives the state courts greater leeway in

17  reasonably applying that rule, which in turn "translates to a narrower range of

18  decisions that are objectively unreasonable under AEDPA." Cheney v. Washington,

19  614 F.3d 987, 995 (9th Cir. 2010) (citing Yarborough v. Alvarado, 541 U.S. 652,

20  664 (2004)). When Section 2254(d) applies, "the question is not whether counsel's

21  actions were reasonable. The question is whether there is any reasonable argument

22  that counsel satisfied Strickland's deferential standard." Harrington, 131 S. Ct. at

23  788. A court need not determine whether counsel's performance was deficient

24  before examining the prejudice suffered by the defendant as the result of the alleged

25  deficiencies. See Strickland, 466 U.S. at 697; Williams v. Calderon, 52 F.3d 1465,

26  1470 & n.3 (9th Cir. 1995) (applauding district court's refusal to consider whether

27  counsel's conduct was deficient after determining that petitioner could not establish

28  prejudice)

Order Denying Petition; Denying Certificate of Appealabilty
G:\PRO-SE\SJ.EJD\HC.10\Birelas01355_deny petition-coa.wpd   20

1

   b.    <u>Analysis</u>

2
       The state appellate court rejected Petitioner's prosecutorial misconduct

3
claims as follows:

4
       On appeal, [Petitioner] maintains that the prosecutor's mention of
5
Nortenos and Surenos constituted misconduct, which was "particularly
prejudicial" because Jessica's testimony required corroboration. In
6
[Petitioner's] view, "ordinary jurors, however sincere, have conscious or
subconscious difficulty applying the accomplice corroboration
7
requirement of section 1111. At least some jurors – if they deem an
accomplice's testimony to be credible on its face – will have a
8
deep-seated reluctance to acquit because of the inconvenient fact of
insufficient corroboration of the accomplice's testimony. This
9
reluctance will be greatly amplified by the additional circumstance of
the [Petitioner] being perceived as a 'gang-banger.'"

10
       "The applicable federal and state standards regarding
11
prosecutorial misconduct are well established.'" A prosecutor's ...
intemperate behavior violates the federal Constitution when it comprises
12
a pattern of conduct 'so egregious that it infects the trial with such
unfairness as to make the conviction a denial of due process.'"'
13
[Citations.] Conduct by a prosecutor that does not render a criminal trial
fundamentally unfair is prosecutorial misconduct under state law only if
14
it involves ""the use of deceptive or reprehensible methods to attempt to
persuade either the court or the jury.'"" [Citation.]" (<u>People v. Samayoa</u>
15
(1997) 15 Cal.4th 795, 841; <u>People v. Smithey</u> (1999) 20 Cal.4th 936,
960; <u>People v. Rundle</u> (2008) 43 Cal.4th 76, 157.) "Under California
16
law, a prosecutor commits reversible misconduct if he or she makes use
of 'deceptive or reprehensible methods' when attempting to persuade
17
either the trial court or the jury, and when it is reasonably probable that
without such misconduct, an outcome more favorable to the defendant
18
would have resulted. [Citation.] Under the federal Constitution,
conduct by a prosecutor that does not result in the denial of the
19
defendant's specific constitutional rights – such as a comment upon the
defendant's invocation of the right to remain silent – but is otherwise
20
worthy of condemnation, is not a constitutional violation unless the
challenged action "'so infected the trial with unfairness as to make the
21
resulting conviction a denial of due process.'" [Citation.]" (<u>People v.
Rundle, supra</u>, 43 Cal.4th at p. 157; <u>see also People v. Smithey, supra</u>,
22
20 Cal.4th at pp. 959-960.)

23
       "It is, of course, misconduct for a prosecutor to 'intentionally
elicit inadmissible testimony.'" (<u>People v. Bonin</u> (1988) 46 Cal.3d 659,
24
689, <u>overruled on another point in People v. Hill</u> (1998) 17 Cal.4th 800,
822-823.) Assuming misconduct during the questioning of Jessica,
25
however, we find no basis for reversal on either federal or state grounds.
The improper mention of Nortenos and Surenos was brief, indirect, and
26
isolated. It did not point to [Petitioner] or even to the occupants of
Apartment 233 as having any gang affiliation, and the context of it was,
27
according to Jessica, a made-up story told to detectives during police
questioning. Thus, the single question did not amount to "an egregious
28
pattern of conduct that rendered the trial fundamentally unfair in denial
of defendant's federal constitutional right to due process of law."

(People v. Smithey, supra, 20 Cal.4th at p. 961.) Nor can we find a reasonable probability that a result more favorable to [Petitioner] would have occurred had the prosecutor refrained from that brief reference to gangs. (Cf. People v. Rundle, supra, 43 Cal.4th at p. 157.) The trial court instructed the jury both before and after the presentation of testimony that "[n]othing that the attorneys say is evidence ... their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence. The attorneys' questions are significant only if they help you to understand the witnesses' answers. Do not assume that something is true just because one of the attorneys asked a question that suggested that is was true." The court reminded the jurors that if an objection was sustained, they must ignore the question, and if the witness was not permitted to answer, they must not guess at what the answer might have been. "We presume the jury followed the court's detailed instructions regarding this matter and conclude that, in light of the instructions, there is no reasonable likelihood the jury was misled by the prosecutor's improper question." (People v. Smithey, supra, 20 Cal.4th at p. 961.) As no prejudice is shown, reversal is not warranted on this ground.

People v. Birelas, No. H031803, 2009 WL 296997 at *7.

After a careful review of the record, the Court cannot say that the state court's denial of Petitioner's prosecutorial misconduct claim was contrary to or involved an unreasonable application of clearly established federal law, or that it resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

The prosecutor's reference to gangs was one brief question posed to Jessica, regarding the veracity of statements made during her interview with Detective Calderon. Doc. #30 at 2091–93. Jessica had stated in her police interview that her sister Juliana had claimed to be nervous because the neighbors had guns. Doc. #19 at 767–68. At trial, Jessica testified that she had been lying about what Juliana said. Doc. #24 at 2091. In an attempt to impeach her, the prosecutor attempted to ask whether Jessica was referring to a gang shootout when she discussed her neighbors' possession of guns. Doc. #30 at 2091. The question was interrupted and immediately objected to by defense counsel. Defense counsel's objection was sustained by the trial court. Id. at 2091. There was no further reference to gangs during the trial. The trial court instructed the jurors as follows:

Nothing that the attorneys say is evidence . . . their remarks are not

United States District Court
For the Northern District of California

<div style="float:left">United States District Court<br>For the Northern District of California</div>

evidence. Their questions are not evidence. Only the witnesses' answers are evidence. The attorneys' questions are significant only if they help you to understand the witnesses' answers. Do not assume that something is true just because one of the attorneys asked a question that suggested that is was true.

During the trial the attorneys may have objected to questions or moved to strike answers given by the witnesses. I ruled on the objections according to the law. But if I sustained an objection, you must ignore the question. If the witness was not permitted to answer, do not guess what the answer might have been or why I ruled as I did.

Doc. #33 at 2782–83. Based on this record, the Court concludes that the prosecutorial misconduct did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." Johnson, 63 F.3d at 929. This Court agrees with the state appellate court's conclusion that the prosecutorial misconduct was "brief, indirect, and isolated." People v. Birelas, 2009 WL 296997 at *7. Nor did the question identify Jessica or Petitioner as gang members. Furthermore, because jurors are presumed to follow a court's instructions, see, e.g., Richardson v. Marsh, 481 U.S. 200, 206 (1987), this Court presumes the trial court's instruction eliminated the risk of any impermissible inferences being made from the prosecutor's question. Finally, as discussed above, there was sufficient evidence of guilt presented at trial. Accordingly, the Court must deny Petitioner habeas relief on his claim of prosecutorial misconduct.

For these same reasons, the Court also must deny Petitioner habeas relief on his claim of ineffective assistance of trial counsel for failure to seek a curative instruction with respect to the alleged prosecutorial misconduct. As discussed above, the record does not support a finding that the prosecutor's question, assumed to be misconduct, had a substantial and injurious effect on the jury's verdict; accordingly, this Court finds that Petitioner has failed to demonstrate prejudice. See Strickland, 466 U.S. at 693–94. Applying the required "doubly" deferential judicial review in reviewing this ineffective assistance of counsel claims, this Court cannot say that there is not any "reasonable argument that counsel satisfied Strickland's deferential standard." Harrington, 131 S. Ct. at 788. As Respondent

United States District Court
For the Northern District of California

1   notes, the prosecutor's question did not identify Jessica or Petitioner as gang

2   members and at most, implied that the neighbors possessed guns because they were

3   gang members.  It was reasonable for defense counsel to refrain from seeking a

4   curative objection and drawing more attention to a seemingly tangential line of

5   questioning.  See, e.g., Dubria v. Smith, 224 F.3d 995, 1004 (9th Cir. 2000) ("Given

6   the ambiguity in these words, we conclude that a reasonably competent attorney

7   could have refrained from objecting.").

8          3.      Ineffective Assistance of Appellate Counsel

9          Petitioner also argues that appellate counsel was ineffective for failing to

10  argue on appeal that Petitioner was denied a speedy trial, that the accomplice

11  confession was inadmissible, and that there was insufficient evidence to support his

12  conviction.

13                a.      Standard

14         The Due Process Clause of the Fourteenth Amendment guarantees a criminal

15  defendant the effective assistance of counsel on his first appeal as of right.  Evitts v.

16  Lucey, 469 U.S. 387, 391–405 (1985).  Claims of ineffective assistance of appellate

17  counsel are reviewed according to the standard set out in Strickland v. Washington,

18  466 U.S. 668 (1984).  Smith v. Robbins, 528 U.S. 259, 285 (2000); Moormann v.

19  Ryan, 628 F.3d 1102, 1106 (9th Cir. 2010); Miller v. Keeney, 882 F.2d 1428, 1433

20  (9th Cir. 1989).  First, the petitioner must show that counsel's performance was

21  objectively unreasonable, which in the appellate context requires the petitioner to

22  demonstrate that counsel acted unreasonably in failing to discover and brief a

23  merit-worthy issue.  Smith, 528 U.S. at 285; Moormann, 628 F.3d at 1106.  Courts

24  indulge a strong presumption that counsel's conduct falls within the wide range of

25  reasonable professional assistance.  See Strickland, 466 U.S. at 689.  Second, the

26  petitioner must show prejudice, which in this context means that the petitioner must

27  demonstrate a reasonable probability that, but for appellate counsel's failure to raise

28  the issue, the petitioner would have prevailed in his appeal.  Smith, 528 U.S. at

285–86; Moormann, 628 F.3d at 1106.

It is important to note that appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant. See Jones v. Barnes, 463 U.S. 745, 751–54 (1983); Gerlaugh v. Stewart, 129 F.3d 1027, 1045 (9th Cir. 1997); Miller, 882 F.2d at 1434 n.10. The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. See id. at 1434. Appellate counsel therefore will frequently remain above an objective standard of competence and have caused his client no prejudice for the same reason – because he declined to raise a weak issue. Id.

> b.   Analysis
>
> 1)   Speedy Trial Claim

Petitioner argues that appellate counsel was ineffective for failing to present on appeal a claim that Petitioner's right to a speedy trial was violated. Petitioner raised this claim in his state petitions for a writ of habeas corpus before the Superior Court, Court of Appeal, and California Supreme Court, all of which denied this claim. The state trial court stated that "Petitioner has failed to demonstrate that but for counsel's alleged ineffectiveness, the result on appeal would have been more favorable" and cited Strickland. Doc. #11, Exh. 12. The state appellate court and California Supreme Court issued summary denials of their respective petitions. Pursuant to Ylst, this Court applies 28 U.S.C. § 2254(d) to the state trial court's opinion. Having reviewed the record, the Court cannot say that the state trial court's decision was either contrary to, or involved an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts in light of the evidence.

Petitioner was arraigned on November 8, 2006. Doc. #13 at 410, 417. Cal. Penal Code § 1382 provides that a trial must be held within 60 days of arraignment; accordingly, the last day for Petitioner's trial was January 8, 2007. Petitioner was to be tried with Jessica, Juliana, Fernanda, and Uriel Luengas. His trial was initially set

United States District Court
For the Northern District of California

1   for January 2, 2007, <u>id.</u> at 410, and continued to January 8, 2007, Doc. #14 at 523

2   and Doc. #37 at 3.  At the pre-trial hearing on January 5, 2007, the trial granted

3   Petitioner's motion to sever his trial from co-defendants Juliana and Jessica but

4   denied his motion to sever his trial from co-defendant Uriel Luengas.  Doc. #37 at

5   4–6.  At this pre-trial hearing, the trial court also granted Uriel Luengas' motion to

6   continue the trial to allow his newly appointed counsel time to prepare, despite

7   Petitioner's objections:

| | |
|---|---|
| THE COURT: | [Luengas' counsel] is only appointed, I believe, in November or early December to represent Luengas, who's involved in a three-week sexually violent predator case during that entire period.  He's presented – he's filed a motion for a continuance.  I find good cause for the continuance based on the volume of discovery that he's been presented with and he hasn't had a chance to digest yet, because Mr. Luengas' case and [Petitioner's] case are inextricably intertwined and there's a strong policy in keeping it together as codefendants.  The circumstances in Mr. Luengas's case will require that we continue the case notwithstanding [Petitioner's] speedy trial rights. |
| [Petitioner's Counsel]: | With regard to [Petitioner], we object to any continuance of the trial date and still do not waive time. |
| [Prosecutor]: | If I may also address the Court.  Again, the People have never requested a continuance in this matter.  I think that was stated by [Petitioner's counsel] at a previous hearing.  It's clear that the People are not requesting a continuance, but in [Luengas' counsel's] defense, I would like to note that the discovery is voluminous in this case.  There are literally thousands of pages of materials to be covered, including the preliminary transcript which [Luengas' counsel] was not a part of.  The actual statements of the various players in this case, literally a little over 13 hours long, and there are hundreds of pieces of exhibits and so forth that still have not been processed and been allowed for [Luengas' counsel] to view at the Watsonville Police Department.  I just want to put that on the record, as well as it relates to the length of continuance that may be requested. |
| [Petitioner's counsel]: | As I understand [prosecutor's] comments, maybe correct me if I am wrong, that he is not requesting a continuance of my client's case under [California Penal Code] section 1050.1, or is he? |
| [Prosecutor]: | People are requesting continuance under 1050.1 as it relates to the request by [Luengas' counsel] on behalf of |

1

2          THE COURT:                 Mr. Luengas.

                                      All right.  [Luengas' counsel], the whole basis for the
3                                     continuance is your need to get better prepared for trial,
                                      however long that will take.

4          [Luengas' counsel]:        To get prepared for trial or, you know, it's difficult to
5                                     say of the volume of material.  My request that we
                                      actually come back in a month so that I can figure out
6                                     how much time I need to get ready for trial.  It's going to
                                      take me a long time to get through the material for the
7                                     first time.

           Id. at 5–6.
8

9          On January 31, 2007, Petitioner filed a motion to dismiss the information for

10   violation of his right to speedy trial, and noticed it for a hearing on February 13,

11   2007.  On February 7, 2007, Petitioner re-noticed the motion for hearing on March

12   2, 2007.  Doc. #14 at 525–29, 536–41.  At the March 2, 2007 hearing, the trial court

13   denied Petitioner's motion to dismiss.  The trial court specified that the trial was not

14   being continued pursuant to Cal. Penal Code § 1050.1, but instead the motion was

15   denied pursuant to the "good cause" exception set forth in Cal. Penal Code § 1382.

16   The trial court found that the strong interest in trying Uriel Luengas and Petitioner

17   together and in providing Uriel Luengas' newly appointed defense counsel time to

18   prepare for trial constituted good cause under Cal. Penal Code § 1382:

19         THE COURT:                 It's the [California Penal Code section] 1382 [that] says that
                                      except for good cause shown, the Court's decision was based
20                                    on both cases on showing of good cause.  The Court's of – the
                                      codefendant cases whether or not they are charged in the same
21                                    information and not one, continue cases finding good cause
                                      where a codefendant's trial rights are implicated because of
22                                    problems that the codefendant has with their counsel's either
                                      unavailability or the fact that they haven't prepared yet.

23                                    This is a complicated case, a murder case with significant
                                      charges in both cases.  The record will reflect for a long period
24                                    of time the codefendant Uriel Luengas was represented by
                                      private counsel who did not do an adequate job preparing to
25                                    defend him.  The case was handed over to the Public Defender
                                      only shortly before the first continuance.  I noted going through
26                                    the file [Petitioner] had made three separate motions for
                                      continuance before the preliminary hearing, and himself
27                                    delayed the prosecution of the matter for more than 90 days due
                                      to those continuances.  The second continuance here was for 30
28                                    days with the understanding after the first one that [Luengas'

United States District Court
For the Northern District of California

1  counsel], I believe, was supposed to represent [Petitioner] as the Public Defender was – was just finishing an SVP case at the time he was first appointed. The first motion was made several weeks after his appointment, the second motion was not too long after that. And the Court was fully aware of his time constraints and that the fact that it was a complicated case and weighed all that and determined that good cause existed in both cases to grant the motion. This motion is denied.

[Prosecutor]:  For the record, Your Honor, this Court in the light of new Counsel being appointed for Mr. Luengas did grant the severance motion over my objection to accommodate [Petitioner's counsel] weighing the fact –

THE COURT:  The issues raised in these cases where the State, because either prosecution is not ready to go or because the State didn't provide the Public Defenders with adequate resources and contributed in some way to the delay. In neither case is that the case --- when that did finally happen, we did sever the case because the Public Defender wanted to shift the attorneys inside their office. But both of these cases, the People were ready to go on trial on both cases when the continuances were granted, and in neither case could it be said that the problem with [Luengas' counsel] not being ready was due to any lack of resources in the Public Defender's office, it was due to the fact that private counsel who had represented Mr. Luengas didn't do an adequate job, not prepared anything, had not investigated anything over many, many months, and left [Luengas' present counsel] with a jumble of papers to go through to start to prepare for the case. In addition, I'll point out for the record, there has been no showing of any kind of prejudice to [Petitioner] in the short delay.

Doc. #38 at 504–06.

On March 12, 2007, the prosecution filed an amended information deleting the enhancement for use of a gun under Cal. Penal Code § 12022.53(b) and (e)(1) to substitute an enhancement for discharge of a firearm under Cal. Penal Code § 12022.53(d). Doc. #13 at 407–09 and Doc. #14 at 552–54. Petitioner was arraigned on March 14, 2007. Doc. #14 at 578. Minute orders of February 22 and March 1, 2007 reflect that Petitioner appeared with counsel at status conferences and stated that "Time continues to be waived." Id. at 548. Petitioner's trial started on March 21, 2007, approximately two months and three weeks beyond the 60-day time period set forth in Cal. Penal Code § 1382.

On November 9, 2007, appellate counsel moved to augment the record.

United States District Court
For the Northern District of California

1   Appellate counsel sought to obtain and review the transcript of all three hearings

2   relating to the denial of Petitioner's motion to dismiss, stating that he needed to

3   review the transcripts "[i]n order to evaluate the issue of possible error in the denial

4   of the motion to dismiss." Doc. #11, Exh. 5 at 3.  On December 4, 2007, the state

5   appellate court granted the motion to augment.  On February 4, 2008, the augmented

6   record was filed, and on May 5, 2008, three months later, Petitioner's opening

7   appellate brief was filed without a speedy trial violation claim.  Doc. #11, Exh. 15.

8          To establish that appellate counsel was ineffective for failing to raise the

9   speedy trial violation claim, Petitioner must (1) overcome the "strong presumption

10  that [appellate] counsel's conduct [fell] within the wide range of reasonable

11  professional assistance," Strickland, 466 U.S. at 689, and show that appellate

12  counsel acted unreasonably in failing to brief a merit-worthy issue, Smith, 528 U.S.

13  at 285; and (2) demonstrate prejudice, e.g., a reasonable probability that, but for

14  appellate counsel's failure to raise the issue, Petitioner would have prevailed in his

15  appeal, id. at 285–86.  With regard to the first prong, the Supreme Court has held

16  that appellate counsel need not, and should not, raise every nonfrivolous claim.

17  Smith, 528 U.S. at 288.  Instead, appellate counsel should select from among the

18  various appealable issues "in order to maximize the likelihood of success on

19  appeal." Id.  In discussing this standard, the Supreme Court noted that "it is still

20  possible to bring a Strickland claim based on counsel's failure to raise a particular

21  claim, but it is difficult to demonstrate that counsel was incompetent. See, e.g., Gray

22  v. Greer, 800 F.2d 644, 646 (7th Cir. 1986) ("Generally, only when ignored issues

23  are clearly stronger than those presented, will the presumption of effective assistance

24  of counsel be overcome")." Id.  With regard to the second prong, "[a] reasonable

25  probability is a probability sufficient to undermine confidence in the outcome."

26  Strickland, 466 U.S. at 694.  It is not enough to show that counsel's errors had some

27  conceivable effect on the outcome of the proceeding because "virtually every act or

28  omission of counsel would meet that test . . . and not every error that conceivably

United States District Court
For the Northern District of California

1  could have influenced the outcome undermines the reliability of the result of the

2  proceeding." Id. at 693 (internal citation omitted).

3       In light of the applicable standard of review, the inquiry here is whether the

4  state court's decision was objectively unreasonable under Strickland and Smith.

5  See, e.g., Rompilla v. Beard, 545 U.S. 374, 380 (2005). This Court finds that the

6  state court's denial of Petitioner's claim was reasonable. First, the record supports

7  the presumption that appellate counsel provided reasonable professional assistance.

8  Appellate counsel was aware of the speedy trial claim and obtained relevant hearing

9  transcripts for the express purpose of evaluating the merits of this claim. After

10  reviewing the transcripts, appellate counsel deliberately chose not to include this

11  claim in Petitioner's opening brief. "A reasonable tactical choice based on an

12  adequate inquiry is immune from attack under Strickland." Gerlaugh v. Stewart,

13  129 F.3d 1027, 1033 (9th Cir. 1997) (citing Strickland, 466 U.S. at 689–91).

14  Second, Petitioner fails to demonstrate that he would have prevailed upon appeal if

15  appellate counsel had raised the speedy trial claim. A trial court has "broad

16  discretion to determine whether good cause exists to grant a continuance of the

17  trial," and the appellate court reviews the trial court's decision for abuse of

18  discretion. People v. Jenkins, 22 Cal. 4th 900, 1037 (2000) (citing Cal. Penal Code

19  § 1050(e)). The California Supreme Court has held that "a good-cause

20  determination under [Cal. Penal Code] § 1382 involves an assessment of a number

21  of factors: (1) the legitimacy and strength of the justification for the delay, (2) the

22  duration of the delay, and (3) the likelihood or probability that the delay will

23  prejudice or adversely affect any party." People v. Sutton, 48 Cal. 4th 553, 556–67

24  (2010). The trial court assessed these factors, and found good cause where the two-

25  and-a-half month delay did not prejudice Petitioner, the delay was not caused by the

26  prosecution, Petitioner's case was "inextricably interrelated" with Uriel Luengas'

27  case, Doc. #11, Exh. 4 and Doc. #37 at 5, and Uriel Luengas would be denied

28  effective assistance of counsel if the continuance were not granted. Accordingly, the

United States District Court
For the Northern District of California

1    state appellate court reasonably concluded that the inclusion of a speedy trial claim

2    would not have resulted in Petitioner prevailing upon appeal. The Court must deny

3    Petitioner habeas relief on this claim of ineffective assistance of appellate counsel.

4                    2)    Admissibility of Accomplice Testimony

5            Petitioner argues that appellate counsel was ineffective for failing to present

6    on appeal a claim that evidence should have been precluded as uncorroborated

7    accomplice testimony. The state trial court denied this claim, finding that the

8    admissibility of accomplice testimony "was more than adequately addressed by

9    Petitioner's appellate counsel, based on the [trial court's] review of the unpublished

10   opinion of the Court of Appeal." Doc. #11, Exh. 12. As discussed above, pursuant

11   to Ylst, this Court applies 28 U.S.C. § 2254(d) to the state trial court's denial of this

12   claim. Having reviewed the record, the Court cannot say that the state trial court's

13   decision was either contrary to, or involved an unreasonable application of, clearly

14   established federal law, or that it was based on an unreasonable determination of the

15   facts in light of the evidence.

16           Petitioner fails to demonstrate that appellate counsel acted unreasonably in

17   failing to present this claim on appeal. This claim is, in substance, similar to his

18   instructional error claim. In essence, it appears that Petitioner is arguing that the

19   testimony of Jessica, Fernanda and Juliana should not have been admissible because

20   they were uncorroborated by the non-accomplice witnesses. Doc. #1 at 12. This

21   appears to be predicated on Petitioner's belief that Jessica should be considered an

22   accomplice witness, and that her testimony should therefore be inadmissible as a

23   matter of law. As discussed above, the trial court reasonably found that there was a

24   factual dispute as to whether Jessica was an accomplice and, based on the evidence

25   at trial, a jury could reasonably find that Jessica was not an accomplice. Moreover,

26   Respondent correctly points out that whether and how the accomplice testimony and

27   Jessica's testimony could be considered was a subject for instruction, not for

28   preclusion. Cal. Penal Code § 1111 provides that a conviction may not be based

1   upon the testimony of an accomplice, unless the accomplice testimony is

2   corroborated by other evidence; Section 1111 does not render accomplice testimony

3   inadmissible.  See Laboa, 224 F.3d at 979 ("[Cal. Penal Code] § 1111 'does not

4   render uncorroborated accomplice testimony inadmissible.'") (citing In re Mitchell

5   P., 22 Cal.3d 946, 950 n.2 (1978)).  Accordingly, appellate counsel could have

6   reasonably decided that this claim was not merit-worthy, or that this claim was better

7   framed as an instructional error.

8           Nor is Petitioner able to demonstrate prejudice.  The state court implicitly

9   addressed this claim in finding that there was limited evidence to support a finding

10  that Jessica was an accomplice, Doc. #33 at 2777, and testimony that Jessica was not

11  involved in the planning or execution of the robbery, Doc. #27 at 1314–15, 1554,

12  Doc. #28 at 1649–50, Doc. #28 at 1831.  Additionally, this claim is similar in

13  substance to the instructional error claim, which was rejected by the state appellate

14  court.  The record does not support a finding that Petitioner would have been

15  successful on appeal if appellate counsel had presented a claim attacking the

16  admissibility of Jessica's testimony, or the testimonies of Fernanda and Juliana.  The

17  Court must deny Petitioner habeas relief on this claim of ineffective assistance of

18  appellate counsel.

19                        3)      Sufficiency of the Evidence

20          Petitioner argues that appellate counsel was ineffective for failing to present

21  on appeal a claim that there was insufficient evidence to support his conviction.

22  Specifically, Petitioner contends that there was no substantial evidence that

23  corroborated the accomplice testimony, as required by Cal. Penal Code § 1111.  This

24  claim is also similar in substance to Petitioner's instructional error claim.

25          The state trial court denied this claim, finding that the sufficiency of evidence

26  claim "was more than adequately addressed by Petitioner's appellate counsel, based

27  on the [trial court's] review of the unpublished opinion of the Court of Appeal."

28  Doc. #11, Exh. 12.  As discussed above, pursuant to Ylst, this Court applies 28

United States District Court

For the Northern District of California

1    U.S.C. § 2254(d) to the state trial court's denial of this claim. Having reviewed the

2    record, the Court cannot say that the state trial court's decision was either contrary

3    to, or involved an unreasonable application of, clearly established federal law, or

4    that it was based on an unreasonable determination of the facts in light of the

5    evidence.

6        Applying the legal standard for ineffective assistance of appellate counsel

7    articulated above, the Court finds that Petitioner fails to demonstrate that this claim

8    is merit-worthy or that appellate counsel acted unreasonably in failing to raise this

9    issue on appeal. In evaluating an insufficiency of the evidence claim, California

10   courts

> must review 'the whole record in the light most favorable to the
> judgment' and decide 'whether it discloses substantial evidence ... such
> that a reasonable trier of fact could find the defendant guilty beyond a
> reasonable doubt.' (People v. Johnson, supra, 26 Cal.3d 557, 578, 162
> Cal.Rptr. 431, 606 P.2d 738.) Under this standard, the court does not
> "'ask itself whether *it* believes that the evidence at the trial established
> guilt beyond a reasonable doubt." [Citation.] Instead, the relevant
> question is whether, after viewing the evidence in the light most
> favorable to the prosecution, any rational trier of fact could have found
> the essential elements of the crime beyond a reasonable doubt.'
> (Jackson v. Virginia (1979) 443 U.S. 307, 318, 319, 99 S.Ct. 2781, 61
> L.Ed.2d 560.).

18   People v. Hatch, 22 Cal. 4th 260, 272 (Cal. 2000) (emphasis in original).

19       After carefully reviewing the record and the relevant standards, this Court

20   cannot say that the state court was unreasonable in concluding that the sufficiency of

21   the evidence claim was more than adequately addressed by appellate counsel and

22   there was no ineffective assistance of appellate counsel. The record shows that in

23   evaluating the instructional error claim, the state appellate court found that there was

24   no evidence to suggest that the jurors incorrectly evaluated the testimonies of

25   Jessica, Juliana and Fernanda in reaching their verdict. Doc. # 9 at 10. In addition,

26   the trial court denied Petitioner's post-trial motion for a judgment of acquittal under

27   Cal. Penal Code § 1118.1, finding that the evidence did not support a finding that

28   Jessica was an accomplice as a matter of law. Accordingly, appellate counsel

United States District Court
For the Northern District of California

1 reasonably declined to raise the sufficiency of the evidence issue on appeal. The

2 sufficiency of the evidence was adequately addressed by the instructional error claim

3 and appellate counsel could have reasonably concluded from the record before him

4 that a state court, viewing the facts in the light most favorable to the prosecution,

5 would have concluded that a rational trier of fact could have found the essential

6 elements of the crime beyond a reasonable doubt. The Court therefore denies

7 Petitioner habeas relief on this claim of ineffective assistance of appellate counsel.

8 **CONCLUSION**

9 After a careful review of the record and pertinent law, the Court concludes

10 that the Petition for a Writ of Habeas Corpus must be **DENIED**.

11 Further, a Certificate of Appealability is **DENIED**. See Rule 11(a) of the

12 Rules Governing Section 2254 Cases. Petitioner has not made "a substantial

13 showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor has

14 Petitioner demonstrated that "reasonable jurists would find the district court's

15 assessment of the constitutional claims debatable or wrong." Slack v. McDaniel,

16 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of

17 Appealability in this Court but may seek a certificate from the Court of Appeals

18 under Rule 22 of the Federal Rules of Appellate Procedure. See Rule 11(a) of the

19 Rules Governing Section 2254 Cases.

20 The clerk shall terminate any pending motions as moot, enter judgment in

21 favor of Respondent and close the file.

22 SO ORDERED.

23

24 DATED: _7/16/12_

25 EDWARD J. DAVILA
United States District Judge

26

27

28

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


MOISES ISSAC BIRELAS,                         Case Number: CV10-01355 EJD

                    Plaintiff,          **CERTIFICATE OF SERVICE**

     v.

FRANCISCO JACQUEZ et al,

                    Defendant.
_____/


I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on July 17, 2012, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.


Mosies Issac Birelas V-18459
Pelican Bay State Prison
P. O. Box 7500
Crescent City, CA 95531

Dated: July 17, 2012

                              Richard W. Wieking, Clerk
                              /s/ By: Elizabeth Garcia, Deputy Clerk